All right, we're prepared to hear arguments in the case of Yates v. Terry. We'll hear from the Appellate's Council. Good afternoon. Robin Jackson here on behalf of Detective Christopher Terry. Your Honor, we're here today to ask this Court to determine that the force used by Detective Terry against Mr. Yates did not violate any of his constitutional rights. And in the alternative, if the Court determines that it did violate his constitutional rights, we take the position that it was not clearly established as of December 27, 2008, when this incident took place. This was a traffic stop initiated by Detective Terry against Mr. Yates. There were three tasings that were involved in this matter. The first tasing took place when Mr. Yates twisted his body, pulled his arm away from the officer, and told the officer that he was not going to arrest him. How do we, in reviewing this, how are we to look at these facts here? Your Honor, it's very important that with regard to summary judgment, while you would normally take the light most favorable to the non-moving party, when evaluating qualified immunity, you're also required to look at the totality of the circumstances from the perspective of a reasonable officer who was on the scene at the time. That's a broader question. That doesn't change the original duty to look at the facts in the light most favorable. It just says that when you do that, you then also look at the other circumstances. Well, Your Honor, I think that you... It seems to me that what you're doing is really changing the first part of it. Well, Your Honor, what I think you need to do is take into account the officer's vantage point, what the officer knew, what the officer felt, what the officer believed, what the officer, his reactions to the plaintiff's actions. In this case, specifically, the officer testified that every one of his actions was taken in reaction to something that the plaintiff had done. And therefore, even if he was not correct in evaluating what the plaintiff had done, for example, on the second tasing, when the officer's perspective was that the plaintiff was getting up from the ground and the plaintiff's testimony was that he wasn't, the reason that the officer's perspective needs to be considered was because in this case, he was facing a dual-sided threat. That is different from many, many of the qualified immunity excessive force cases that have been decided. The officer had the plaintiff in front of him. He was on the ground. He had already been tased once. And at that point, he has two other individuals who have asserted themselves into the traffic stop coming at him from his rear. They are yelling at him. They are screaming. They are also approaching him. The officer then has to face both the plaintiff, who is on the ground and has been tased once for noncompliance, and the two individuals approaching him from the rear. At what point does that become a jury question, when you have that kind of factual dispute? I mean, if we accept what he says as being the evidence, as you say, the objective reasonable officer, what he thinks, as opposed to what the other side says, at what point do we make that decision here on, at this stage of the proceeding? Or why is that not something the jury can, you haven't lost the case, even if you proceed on to court. Well, Your Honor, it's our position. These are factual disputes. I mean, you've got a mother who is following her son, who is the first sergeant in the National Guard, and ostensibly, the officer pulls him over because his music is loud. Or he says he thinks he's speeding, and he pulls him over. And from the facts here, it appears, though, that he's there with this particular individual. He pulls out his taser. Well, mother doesn't, she says she doesn't know if it's a gun or what. And mother sees son, an officer in a situation with a gun pointed on her son. And then he tasers her. She thinks he's shot. At that point, and, I mean, I understand where you're coming with the facts, but we're here at a different stage of the proceeding. And the question is, do we decide this is a matter of law on these facts, or are these sufficient for some other tribunal to decide? I think this can be decided as a matter of law on the facts that are before the court, because in evaluating the case from a reasonable officer's perspective, we have a difference from many of the cases also in that many of the cases that have been before this court and other courts, you have multiple officers on the scene. You have other perspectives. You have officers who were not involved in the tasing. I don't want to beat this step, but I want to make sure you're telling me what you're saying. That is, if you have an incident where you have one officer and you have testimony of the officer and you have testimony of a number of witnesses, we've got to look at it at what that officer says, because that's a reasonable officer's interpretation. We don't consider this. Why wouldn't every case fit that way? I mean, that doesn't seem to follow to me. I mean, I can see it. There are certain things here he said, the defendant may have said. He said on the third tasing, he says, I didn't reach in my pocket. I mean, that's something we have to accept, that the officer said that too. But at some point in time, there is this objective reasonable standard, but where are we in the process of this and weighing that type of evidence at this stage? And hasn't this court said you must adopt the facts of the person who has been harmed? Yes, Your Honor, and even if you adopt the plaintiff's version of the facts. Argue it from the plaintiff's version. That's all I've been asking you to do. Even adopting the plaintiff's version of the facts, even if the officer made a reasonable mistake in evaluating what the situation was, for example, the plaintiff's testimony that he did not get up, it was the officer's belief that that's what he was doing. He's entitled to make reasonable mistakes. On the whether he got up thing, I mean, if we're looking at it from the plaintiff's facts, I don't understand why wasn't he entitled to get up. He just got stopped in a traffic violation. He's totally compliant. Again, looking at it from his facts, he's totally compliant. He's not resisting arrest. He's got his hands on the car. He gets tased once. Why isn't he allowed to get up? Why is that? Why is the officer's mistaken belief that he was getting up any excuse for tasing him? According to the plaintiff's own testimony and according to the testimony of his mother, he did turn around right before he was tased the first time. His mother's testimony was that he completely turned around. The officer's belief that he was moving possibly for a weapon because he had not been patted down yet and he had been told that he was being placed under arrest. Why would they think he's moving? So anyone who moves their head after a traffic stop can be tased? Your Honor, it was the totality of the circumstances. The officer believed that he had seen the plaintiff lean across the seat before he had pulled over, that he had taken an excessively long time to pull over, and once he did pull over, he did not have his identification with him and the officer wasn't able to determine what was going on with the— He had a military ID? He did not provide—he advised that he had a military ID, but he did not provide it. His own testimony shows that he did not provide that identification. Did the officer ask for it? The officer asked him for his driver's license and the plaintiff provided no identification. When he advised the officer that he had his military ID, did the officer say, okay, show me your military ID? The officer asked him to step out of the car at that point. Which he did. Which he did step out of the car. He put his hands up on the car. He put his hands on the car. Well, according to the officer, he did not completely put his hands up on the car. According to Mr.— Let's stay with the facts. See, that's where we're losing this focus here. I want to follow you, but he says he was standing compliant with both hands on top of his car, turned his head because he heard his mother and his brother. Immediately before that, he testified that the officer was holding his left arm behind his back, so he couldn't possibly have had both of his hands on the car. His mother arrived, and his mother's testimony was that he turned around, which was not in compliance— He turned his head. Well, the mother's testimony was that he completely turned around. Says completely? She says he turned around. Which probably means he turned his head, right? You can reconcile both of those. But that's not what she said. She said that he turned around. And the testimony that we have in this case, even from the plaintiff's side, is very inconsistent. The plaintiff's own statement that he wrote himself and made amendments to is inconsistent with his testimony and his deposition. The complaint itself as testimony is inconsistent with what the plaintiff later testified to as to why he was in the area and where he was going. And so the plaintiff's own version of the facts is inconsistent at times. Why would we pick and choose it then? If it's inconsistent, why would we go pick one side that favors you on it? Well, Your Honor, even at this point, if the plaintiff turns his head to move when the officer is telling him to hold still and provide him his arms and he doesn't, the court has ruled that people who do not comply with an officer's instruction to place their arms behind their backs. But he did not testify that he put his arms behind his back. He said he was compliant, but he had his hands up on the hood. And at that point we have the dual threat. He said he complied. Why is it not he complied? When he was specifically asked about different details, he did not put his hands behind his back when he was asked to so that the officer could handcuff him and place him under arrest. And at that point is when we have the dual threat. I thought if I understood the officer's testimony right, and I may have misunderstood it, so correct me if I'm wrong, that kind of the whole point in your whole argument here is the officer never had a chance to get him in handcuffs. There was so much chaos that he was unable to get Mr. Yates in handcuffs because of the other people on the scene, and so that's your whole argument. There's just chaos. And as long as there's chaos, the officer was reasonably concerned about getting the situation under control, so he used his taser because he didn't have time to use the handcuffs. I didn't even get from your brief or the officer's testimony that he was saying that he had time to put him in handcuffs, but the guy wouldn't give him his hands. Correct. He had asked as the... It was correct. It was correct that he did not have time to put him into handcuffs. He had made the request. The plaintiff had not complied. The officer's testimony, if you're looking at that, says that that's when he actually moved away and got approximately 5 feet away from him, and at that point he made the decision to use the taser to prevent the plaintiff from what he believed was reaching for a weapon, and that was the officer's testimony as to why he tased him. What was the basis for any assertion that he would be reaching for a weapon? Give me some facts. It was the officer's belief that when he was behind him and the fact that he failed to pull over and the fact that he saw him reaching to the right...  What's that got to do about reaching for a weapon? He failed to pull over. He pulled over slowly, okay? He did after the officer had already called for backup because the plaintiff was not stopping. He said he didn't know he was even being stopped. There was really nothing there to say he was doing anything except the loud music. Well, there was the loud music, there was the speeding, there was the crossing of the center line, which was the point when the officer believed that he saw the plaintiff reaching to the right, which, per his own training and experience, generally indicated that a person was either trying to reach for something or hide something within the car. Those things all occurred after the blue lights were on behind him and the car going in and out between them. The officer said that it was very clear before they crossed the overpass that he was behind the plaintiff attempting to initiate a traffic stop. The plaintiff passed several locations where he could have pulled off, which caused the officer to then call for backup because the plaintiff was not stopping. I'm concerned your argument is going clearly, in my view, toward there are all kinds of issues of fact in this case that need to be resolved by a jury. We're not going to resolve issues of fact sitting here. And that's why, on a qualified immunity, they require that you adopt the facts of the plaintiff. We're not here to make all those factual findings. If there are factual findings that need to be made, that's going to be made by a jury. So what your argument has done from the moment you've stood up there is raise issues of fact that would preclude this court from finding qualified immunity. Your Honor, even taking the facts in the light most favorable to the plaintiff, the officer's perspective. That's all we've been asking you to do. Yes, Your Honor. But if you continue to bring up facts that are adverse, and as you say, even they don't agree, it puts us in a conundrum of listening to a case that doesn't fit where we are in the proceedings. It doesn't fit it within the proceeding of where we are. I mean, we've got this established that he pulls over. He says he's compliant, turns his head when he sees his mother. Mother yells, don't shoot my son because she thinks he has a gun. At that point, he stands back and fires the taser. He falls down on the ground. Mother fakes it because she thinks her son has been shot. And then he proceeds to do it again. The mother feigns after the second tasing, after Mr. Yates already has advised her to go back to the car, everything is okay. So he did it the second time because the mother didn't go to the car? Before the second tasing is when the brother and the mother were both approaching him. The brother is yelling, what are you doing? Why are you arresting my brother? The mother is yelling at him not to shoot. And even the brother's testimony was. What does Yates do? Yates is telling his mother to go back to the car. He's not resisting. He's not resisting. He's telling her to go back to the car. Like what the officer wanted to happen. This was after the first tasing, yes. That was after the first tasing, and then he tased him a second time. Correct? That was Mr. Yates was telling the mother to go back to the car after the first tasing, before the second tasing. After the first tasing. So we don't have a resisting police officer here. We've got the officer told the mother to go back to the car. Mr. Yates, who has been tased, says, Mom, I'm okay, go back to the car. And he tases him a second time. That's when the officer sees him trying to get up. So you have a little time to rebuttal. Why don't we allow you to collect your thoughts and come back to us, and we'll hear from the upper lead in this case. Thank you. Thank you, Your Honor. I think it's pretty well established that we are supposed to be using the facts as presented by the appellee in this case, and I think that those facts have been set forth in fairly decent detail with respect to also citations to the record in the brief. I will not recite them in the interest of time. I will admit there is a slight correction that needs to be made. I believe that in my preparation, I believe I've determined that Mrs. Yates, the mother, actually passed out after watching her son tase the third time instead of the second time. And so that's something that may need to be addressed later. I want to make sure that that's correct. It doesn't actually affect the analysis in this case, but I do want to make sure the facts as we have set them forth are correct. I think it's remarkable right now that the appellant is asking this court to find that this, I would say, violent attack on Sergeant Yates, who was unresisting, who was compliant, who was nonviolent, who was not fleeing, who was eventually prone on the ground, is some sort of gray area that's protected by qualified immunity. I think that the facts as presented by Sergeant Yates as set forth in the brief, as you're supposed to view them in a summary judgment motion, show that the behavior of Christopher Terry in this instance was unnecessary. It was gratuitous. It was disproportionate to what happened there. I think that that's language I'm tracking right now from the Myers case cited in the brief. Familiar, I believe, to Judge Winn. I believe I saw your name on that opinion earlier. The Myers case, I think, is very applicable here because it shows that as far back as, I see I don't have the date here, but well before 2008, the law enforcement community was on notice that you are not allowed to tase a subject that is not resisting arrest, who is immobile, who is not presenting a danger to police officers. And that's important because, as you all know, in a qualified immunity analysis, we look to see if the law is clearly established at the time the conduct took place. And that's why Myers is— There were three tasings here. The trial judge asked for the third tasing, admitted this is close. And I'm beginning to believe he's saying it's close because even Yates says he's reaching for a phone in his waistband. Yes, Your Honor. And the case law is pretty clear. That in and of itself or actions of that type can indicate that you are—that the person is reaching for a gun. An officer in that position would not be precluded from having the advantage of qualified immunity because at that point in time it's not—at least not clearly established that it's at. What you've described there, Your Honor, is what we would call a segmented approach to examining this. And that's something that the—I believe in Rowland v. Perry, that's 41 F. 3rd 167, in the Rowland case, the Fourth Circuit clearly denied—well, sorry, clearly did not use and rejected that analysis where you take the acts— Well, these are the same type of acts. I mean, I'm not sure the segmented approach—I don't remember all the facts of that case, but I'm just trying to partial where we are. You've got an individual who's been tased, and he's tased again, and before the third one he's actually reaching for something, and he's reaching in his band. I mean, I don't know if the law goes so far as to say, well, because you didn't have it for the first two, the fact that he's reaching for something now, that doesn't apply. That's not what you're saying, is it? Well, Your Honor, what I'm saying is that it is—when we talk about the Rowland case, that's a case where there was an instinctual action. There was a reflex when somebody was grabbed. And that was not a tasing case. That was just a beating case. Another recent one, Smith v. Ray, that's a 2015 case, 781 F. 395. That was another one where the behavior of the person being arrested did move into an area of— see, I don't have it listed exactly what it was. I believe this was where a person was being really not even detained, but being talked to, spoken with, interacted with by a police officer who touches her or slams a door, and she bounces back. She reacts to it. And then later on, when he is engaging in what we would call an illegal seizure of her, she then pulls away. She is reacting. It's a justified reaction to an unlawful seizure. And one way to look at this reaching for Mr. Yates, reaching for— You realize that case you just described deals with active involvement by both parties. She's reacting to something he has definitely done to her, whereas this case, he's down on the ground. He's been tased twice. There's no reason for him to reach in the waistband that's evident to the police officer. I mean, he says he's reaching for a phone, and he probably was. He's reaching for his phone or whatever, but even his version of it, if you're just reaching into somewhere after being tased, I mean, the law is pretty clear on that. It becomes a close question, but it is also—he does announce what he's doing. He's trying to get in touch with his commanding officer. Who else can he call for help at this point? He certainly can't call the police, can he? Do we have some disputed facts here? I thought that he testified he wasn't reaching into his pocket. His phone is on the outside of his pants, and the brother testifies that the officer knew, like said, go ahead, give him your phone, right? It is the—according to the appellee, yes, the phone was clipped, obviously, to his waist. This would have been something that would have been seen as he got out of the car, and I'm assuming a reasonable and very competent police officer would scan the person as he's coming out and see what is this. That is a phone, or it's a beep, or whatever it is. In that regard, in some ways, the officer, or in this case, now detective at that point, Officer Terry, would have known what this was. I thought also the brother—am I wrong about this? I thought the brother testified, oh, yeah, the officer knew it was a phone, and that he slid the phone to me before he— I thought that's why the district court thought there needed to be more factual development on this, sort of exactly what was going on. You may have caught something I didn't catch, Your Honor. I'm going—when I get back to my— No, you're not wrong. You might want to catch it. Yeah, that's something. That's great. No, the brother did testify exactly that, that this officer was on top of everything. This was this officer's stop. He was on top of everything, and he knew that what was being passed by the brother was a phone. That is, if you take it in the light most favorable to the appellee, that is the testimony of the brother. Very good. Well, let's—going back to—I guess maybe let me move over, shift a little bit, and discuss a couple of issues brought up by the appellant here earlier on. When we discussed the getting out of the car, at least according to the—according to Brian Yates, he was pulled out of the car. It wasn't just a get out of the car. There was a grasping. There was a pulling out. That was— We want the facts as the light most favorable. And that is very favorable to my client, Your Honor, that he was pulled out without really any notice, without being informed, by the way, that he was under arrest. If you'll notice, look in the record. He asks him. He asks really the most dangerous question that a man in his position can ask is, why are you pulling me over? And for that, he's pulled out of his car. He is not told why he's being arrested. He says, why are you being arrested? And it is just so I—until I figure something out or something to that effect. That's been said by two others. And so that's a very bad position for him to be in. That also reminds me a lot of a Sixth Circuit case that I didn't cite. I won't talk too much about. But it's—he wasn't told. You'll find that in the jurisprudence in this area, you need to be under arrest. You need to be told you're under arrest. At this point, what is he? He's pulled out of his car. He's told to put his hands on his car, not told why. And then when he reacts to a noise, reacts to something in the background, he's then attacked and then attacked again. Now, something else that should be noted, and feel free to check in the Joint Appendix, but I can't find anywhere it says that he is told to freeze or told to hold still. He's told to put his hands on the car. He complies with this order. That is in the record. He's not told to freeze. He's not told to freeze in place. Don't move. Don't move your head. Never told that. When he's down on the ground after being subjected to the first taser blast, he's not told freeze in place. He's not told to do anything at that point. But then again, at that point, he's already been subjected to one illegal use of force. Oh, the chaos. Really, look at the record when you want to talk about the chaos and the effect of the family members. The evidence really only shows that the brother, Kevin Brown, was the only one that did make any movements. Really, the only movement that Patricia Yates made was down when she passed out. She did not approach. If you look at the evidence cited by, or at least the record cites by, the appellant, which are joint appendix pages 23, 69, 272, 273, 274, 275, that is all primarily Christopher Terry's testimony. That's him saying that Kevin Brown dumped in and charged him. This court is not entitled to take his version of the facts here. That's not how this works today. The remaining citations of the record are the testimony or the statement of Brian Yates where he does say that he approaches, but there's no talk of violence. There's no talk of threats. What you do have, and this is in the response brief, pages 11, 12, and 13, we have plenty of citations to the record, to the deposition of Patricia Yates, to the deposition of Kevin Brown, to the affidavits of other witnesses, that, no, they were complying. They were respectful. They kept their distance. They grew up around law enforcement. They knew not to do this. They knew to stay away and let him do his job. That's the version of the facts that this court has to deal with. Now, if there is any issue of, let's say, of credibility or some sort of inconsistencies, there are inconsistencies. I mean, goodness gracious, I can't tell you what I ate for breakfast a year ago. But these inconsistencies or issues of credibility, we'll sort those out in front of a jury. I'm not worried about that, but it's something that we handle in front of a jury, not in front of this body. Let's see. I may be running out of things to talk to you about here. I really want you to focus on that third one. That third taste. That third taste. Okay. Then I'll reiterate what I said earlier. At that point, Sergeant Yates has been first pulled over for no discernible reason. Of course, if you look at the facts as testified by Sergeant Yates, he didn't have his music loud, he was not speeding, he did not cross any yellow lines. There's no reason he should have been pulled over at all. No reason. So he's pulled over for no reason, one. He is then taken out of his car, not told what he's being arrested for, not being told he's under arrest. When he makes a movement, either instinctual or what it to look, he is then subjected to unlawful force. So now he's been pulled over for no reason. He's been attacked for no reason. He gets attacked a second time for no reason. At this point, you know, you're right. It is a little worrisome taken in out of context and taken in a small window when you see a man on the ground reach to his waist. But when you wrap this back, when you look at those cases I mentioned earlier, when you don't segment this, you look at the totality of it, what you've got is a man who's been subjected to multiple illegal acts, multiple illegal uses of force, illegally pulled over, who had an obvious communication device on an obvious place on his body, who then turns to use that. In some ways that justifies, well, that does, that justifies the behavior, that justifies this. It's much like in, and again, it's true, this is a case, the case of, I believe it's the Smith case, where there was more an active role of both parties, but still at that point that subject was being subjected to illegal force. And she was justified in some ways, almost like self-defense, justified to pull back from that illegal force. Here, what could Sergeant Yates have done? He couldn't get up and run. He still had three taser prongs in his back. What could he do? He can't call the police. The police are the ones attacking him. What does he do? He calls the only person that might be able to help him, the U.S. Army. And so that's how I think that in the light of these circumstances, the totality of these circumstances, that this is acceptable behavior, and this is something that he should not have been tased for, and it does not fall within that gray area that we worry about with qualified immunity analysis. The bright line was crossed a long time ago by Christopher Terry. And so once you are correct, however, when we talk about Myers, that actions can cross over. It happened in Myers. The first few tasings in that one were absolutely protected, but it crossed the bright line. It went from tasing a resisting suspect to a non-resisting suspect. And once that happened, these were all considered acts that were not protected by qualified immunity. I don't think you could consider removing a phone. Admittedly, it is a little unusual, but I don't know if you could consider any sort of resistance to the authority asserted by the officer. And it's certainly not a resistance to lawful authority because none of the authority asserted on Brian Yates was lawful in any way. I don't know if that helps you. I feel like I've just repeated myself. But is there anything else you want to tease out from that that I can help you with? Because I know that isn't it. I think you've taken that as far as you can take it. Can I ask just one quick question? Can I just ask one quick question? Is it clear from the record, and I wondered whether this is also one of the questions that the district court wanted to tease out. Is it clear from the record the precise sequence of events as between, so he takes out his phone, he slides it to his brother to call the commander. The brother says the officer knew what was going on. At what point in that process does he get teased? I mean, he can't have gotten teased before he slides the phone or he wouldn't have been able to slide the phone. So is the record clear as to the precise sequence of events or is that something that the district court thought he needed more factual development on? The latter. I think it is still a little cloudy there, and so the timing of that does need to be teased out and it's going to have to be dealt with before the jury and figure out exactly when. I read this pretty carefully, and I couldn't figure out exactly what the timing on this was. All right. The great benefit of having a lot of witnesses that testify to largely the same thing is that they are all testifying largely to the same thing. The great problem with having many witnesses testifying to largely the same thing is they're not always testifying largely to the same thing, and there's going to be small discrepancies.  It seems kind of important. Yes, that's true. Because if he got tased after he slid the phone to his brother, that seems like that would really matter. It would be a lot harder to say at that point that it was a safety risk. It would seem to be a safety risk. And tasing him before he throws it is, I think would be beyond question, is unauthorized and excessive. Tasing afterwards, as I've set forth probably ad nauseam at this point, is justified in light of the totality of the circumstances, in light of all of the unlawful and unjustified force that's been applied to him. In some ways, eventually you have to fight back, even if it is a small gesture like that. I don't want to eat up any more of y'all's time unless you have any more questions. Thank you very much. Thank you, Your Honor. Ms. Jackson, you have a few minutes for rebuttal, if you like. Thank you, Your Honors. Please focus on the third tase. Yes. With regard to the third tase, the officer, the tasing occurred as he was reaching into the waistband. And with a tasing, it doesn't have an after effect. So when the tasing, when the electricity stops, the person is able, they go back to the same position they were in before the tasing. So it was Officer Terry's position. Into a waistband. See, these facts, and I'm with Judge Harris, when you read this transcript and you look at these facts, it's really difficult to determine the sequence of what's going on here. The district court even said, you know, this is a close one, but district court judges aren't ones that are going out of their way trying to help people who are in a situation like this. But here's a situation where the facts really, his phone is on the outside. And some question of whether or not he takes it out before, is that clear to you, as to whether or not it went before or after? Your Honor, Mr. Yates' testimony was that he was on his stomach and that he reached to his waistband and did not say anything to the officer. He testified, his brother testified. Right, but Mr. Yates testified as to what he was actually doing. And he said, I did not tell the officer what I was doing, I did not tell him, and he reached to his waistband, and he didn't say whether it was the side nearest to the officer, far from the officer. Let me ask, let me ask. Do you think we're bound by just what he said or whether or not his brother, who was a witness, who wasn't being tased, wasn't in the situation, who was just looking at what was going on and hearing everything and focusing on what was going on as opposed to having it done to him? Are we, if a person who's down in that situation says he, I didn't say it, but the brother says, yes, you did, and we're looking at a light most favorable at this stage of the game? Isn't that something we ought to let the jury sort of work out? I don't want to go through that. I mean, we don't need to go through that, do we? Sir, it's my understanding that what the brother said was that Mr. Yates told him to call his commanding officer. He didn't say, I'm going to throw you my phone. He said, he was telling me to call his commanding officer, and in the process of that, he's reaching to the waistband, he's grabbing this black object that the officer did not know what it was based on the officer's testimony, which while we take the facts in the light most reasonable to the plaintiff, the plaintiff could not have possibly known what the officer was understanding. So the officer did not realize it was a, I'm sorry. What the district court said was timing is such an important factor in that case.  When did the defendant, the plaintiff, when did the plaintiff start to grab the cell phone out of his waistband and throw it to his brother? The facts are just not developed to the extent that I can make a decision there. But you're saying that's wrong. Actually, the facts are totally clear. I mean, I just, I don't understand. I read that, and that certainly corresponds when I look at the record. I can't figure out what exactly the timing is and what the sequence is. So why isn't the district court right that it can't award summary judgment at this point? Well, Your Honor, it was my understanding that based on the testimony that the tasing occurred when he was reaching, which would have been as he was grabbing the phone. And as I said before, as soon as that electricity stopped, he would have been able to pull that phone out and throw it to the brother. You disagree with the district court. You do think the record is sufficiently developed. I do think the record is sufficiently developed. Mr. Yates' testimony and everyone's testimony was that after the third tasing and the phone was thrown to the brother, that he became utterly compliant and then put his hands behind his back so that he could be handcuffed. And at that point the brother backed away. The mother had passed out. Other officers were arriving on the scene. And everything went from this very chaotic situation of yelling and screaming, and Mr. Yates testified that he was yelling, the brother was yelling, the mother was yelling, to all of a sudden we now have an utterly compliant situation. Mr. Yates is taken into custody. Handcuffs are applied and he's helped up from the ground. If we assume that the first two tases were not reasonable, if we assume that, then in light of that, what does that mean about the third one? They argue that the third one was justified in light of that, the fact that these others were unreasonable. I'm sorry, I don't understand. I'm asking you, let's assume for a moment, just in this situation with you, let's assume that this officer is not entitled to qualified immunity on the first two. Just assume for a moment that. Could we find that the officer was not entitled to qualified immunity on the first two and find that he was entitled to qualified immunity on the third? And if not, why? Your Honor, I see my time's up. May I respond? Yes, I do. Okay. In the Meyer case, the court established that reaching to the waistband is a grave concern to law enforcement. And I would take the position that no matter what may have happened before that, when the plaintiff reaches to his waistband without identifying to the officer what he's doing or asking permission to be able to do that in the midst of this situation, that that is a grave concern to law enforcement, that that tasing was most certainly reasonable in light of the circumstances that were going on at the time of that third tasing. Let me just change the facts just a little bit. So suppose we accept as a fact that he did say, I want him to call my commanding officer. Let's suppose he said that so the officer knows he wants him to call. Would that have made a difference? I don't believe so, Your Honor, because there was no reason to believe that the brother or the mother didn't have a cell phone in their own possession to call that commanding officer. He didn't say, the only way you can call my commanding officer is with my phone. He just said, call my commanding officer. In 2008, I think it's reasonable for a police officer to consider the fact that the majority of citizens, the majority of adults, have a cell phone, if not on their person, at their disposal. And so I don't think that it was reasonable for the plaintiff to assume that the officer would know that he was reaching for a phone and not some other object. You want the tased man on the ground to give them the telephone number so that they can call on their phone. Well, Your Honor, I don't think that it's reasonable to allow, to put the officer in the position of whether or not the brother may know the commanding officer, who that commanding officer is, whether the brother could get in touch with him without Mr. Yates' phone. For all the officer knew, they were military brothers in the same platoon. Maybe he already knew. When he said, call my commanding officer, maybe the officer, I think it's reasonable for the officer to presume that the brother would be able to do that, that there wasn't necessarily going to be a reason for him to need to help him. Yes, Your Honor. I've got a quick question. So this idea that reaching for the waistband, right, like the furtive gesture, the movement to the waistband, I mean, I just feel like I've read a million cases where that's grounds for a Terry Frisk. But you're not saying that whenever someone reaches for their waistband during a traffic stop, they can be tased, are you? No, Your Honor. But I think in this situation, it was very rapidly evolving. From the time he was still driving to the time of the handcuffs was only two minutes and 43 seconds. We have a gas station that has other persons involved. We've got two other family members who are yelling. And I think under the circumstances that were going on in this specific case with the family members and Mr. Yates, that his reaching for his waistband when the officer had not had a chance to pat him down, the officer did not know what was going on, he didn't even know who this person was because the person hadn't given him his name or provided the identification, that under these specific circumstances, reaching to the waistband was considered a very grave and dangerous concern to the officer. My other question is just very practical. So assuming for a minute that if we did think qualified immunity was justified on the third but not the first two, does it really make any difference in this case? I mean, does it matter much to you and to your client? Well, certainly it matters. Does it matter as to the damages? I'm just trying to, if it's going to trial on the first two. Your Honor, I think it does make a difference. I think it's very important to the officer. He felt that he was acting in a reasonable manner the entire time, that he was taking actions to protect his own safety. I'm sorry, I totally understand that the outcome is important to your client. I misspoke. I absolutely understand that. Your brief, it seemed to me, wasn't really singling out the third use of the taser, and I assume that was because if hypothetically the first two were excessive force, is it going to be a question of damages at the end of the day, assuming two but not three? Do you know? I think it would ultimately go to damages. I think a jury would take that into consideration. I think that those are all elements that would go to whether or not they would award any damages or nominal damages on a claim like this. Okay. I was just trying to figure out what practical difference it made, whether this went to trial on two uses of a taser or three uses of a taser. I think it does certainly make a difference. Okay. Thank you very much. Thank you. All right. The court will come down and greet counsel, and then we'll take a brief recess before proceeding to our next case.
judges: James A. Wynn, Jr., Pamela A. Harris, Loretta Copeland Biggs